**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCISCO FERNANDEZ, *et al*., | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 23 C 4406 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiffs Francisco Fernandez and Sylvia Gonzalez brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 9). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Abbas: Defendant Kathleen Long (Dkt. 205) and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt. 202). In this case, Plaintiff's Amended Complaint alleged that the Chojnacki (as well as some of the Chojnacki entities) violated 18 U.S.C.§ 1962(c), (d), and that

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.
[2] The Chojnacki Defendants include: Marcin Chojnacki; Deodar, Evergreen, & Butternut EC LLC; EJ Investment Group, Inc.; Citypoint Illinois, LLC; Mainstreet Property Management LLC; and TCF National Holdings, Inc. (Dkt. 203).

Defendant Long and some of the other Chojnacki entities violated 18 U.S.C.§ 1962(d). (Dkt. 1 ¶¶128–151).

The Chojnacki Defendants' Motion for Summary Judgment (Dkt. 202) and Long's Motion for Summary Judgment (Dkt. 205) is granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants summary judgment on all state-law claims.

## **BACKGROUND**

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a

real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

**II. The Plaintiffs' Connection**

Fernandez and Gonzalez, both California residents, are out-of-state real estate investors. (Dkt. 211 ¶¶ 4–5, 8–12). In early 2022, Fernandez noticed a Facebook advertisement from Chase Real Estate ("Chase") advertising multifamily investment properties in the Chicagoland area. (Dkt. 211 ¶ 13). Fernandez entered his contact information into a linked site within the advertisement expressing his interest in investing in the advertised properties. (Dkt. 211 ¶ 13). Fernandez shared the information with Gonzalez, who started looking into Chase herself. (Dkt. 211 ¶ 14). Mikosz then started sending Fernandez mass emails which included numerous properties for sale in the Chicagoland area. (Dkt. 211 ¶ 15). While many of the related cases feature Mikosz as the primary interface for the plaintiffs, the present Plaintiffs' primary contact was former defendant Paige Hansen, who settled out of the litigation and was not deposed in the matter. (Dkt. 211 ¶ 3). Fernandez had responded to one of Mikosz' emails saying he and Gonzalez were interested in

investing, but after no response from Ms. Mikosz, Hansen—another real estate agent with Optiv Properties, LLC ("Optiv")—responded from her Optiv email address saying that she could help Mr. Fernandez in his search. (Dkt. 211 ¶ 16). Hansen told the Plaintiffs she was on the same "team" and "family" as Mikosz and thus would not be causing a conflict by taking over their search. (Dkt. 211 ¶ 17). Hansen appeared on the Citypoint website, along with Chojnacki, Mikosz and Rixer. (Dkt. 221 ¶ 43). Hansen also used a "Citipoint" email address. (Dkt. 221 ¶ 43). Plaintiffs state that Hansen copied Chojnacki on emails to them between March and December 2022 (citing only their own deposition testimony and no actual example emails), which the Chojnacki Defendants dispute ever occurred. (Dkt. 223 ¶ 55). Even so, Chojnacki was emailing on behalf of Fernandez in terms of his coordination with various lenders. (Dkt. 223 ¶¶ 70–71, 73).

Hansen presented Fernandez and Gonzalez with a number of properties, including two multifamily properties located in East Chicago, Indiana that are the subject of this lawsuit. (Dkt. 211 ¶¶ 18, 20). These properties are commonly known as 3712 Deodar Street ("Deodar") and 3910 Evergreen Street ("Evergreen") in East Chicago, Indiana (collectively referred to herein as the "Properties"). (Dkt. 211 ¶ 18). Fernandez and Gonzalez stated that Hansen told them that the Properties were owned by mom-and-pop landlords who were seeking to offload the properties below market value. (Dkt. 211 ¶ 24). In actuality, when the Plaintiffs eventually purchased the Properties, they did so from an entity named Deodar, Evergreen & Butternut EC LLC ("Deodar"). (Dkt. 212 ¶¶ 5, 8).

The Plaintiffs decided that Gonzalez would purchase the Evergreen property, while Fernandez would purchase the Deodar Property. (Dkt. 211 ¶ 22). Soon thereafter, both Plaintiffs signed purchase agreements for their respective building with Hansen acting as their agent. (Dkt.

211 ¶ 24).[3] Plaintiffs both admitted to doing little to no research on the area or the real estate market in East Chicago, never visiting the properties or the state; Fernandez testified he just used Google Maps to look at the area before signing, instead relying on Hansen to complete the required due diligence. (Dkt. 211 ¶¶ 25–28). Meanwhile, Hansen routinely represented to Plaintiffs' closing attorney and at least one potential lender for Fernandez that she had very little documentation on the building because the landlord was small, disorganized, and private. (Dkt. 223 ¶¶ 62–63).

Fernandez testified that Deodar Property needed "some help" and that there were "numerous issues" found during a pre-purchase inspection of the building that he had commissioned. (Dkt. 211 ¶ 23). Fernandez testified that he was unable to secure financing for the Deodar Property from a bank because of the issues in the building. (Dkt. 211 ¶ 37). Chojnacki, using his marcin@mychaseagent.com email address, communicated with Fernandez's lender, Skyler, about what interest rates Fernandez would be charged on the loan: "Skyler, we need to know rates and terms. Interest rates have been changing daily. What are the rates and points Francisco will be charged on this loan? Can you please let us know ASAP? Marcin." (Dkt. 223 ¶ 57).

In light of the issues highlighted in the inspection report for the Deodar Property, the appraisal for the property came in at $370,000 (if all the issues were fixed), about $50,000 less than the $420,000.00 price agreed to in the purchase agreement. (Dkt. 211 ¶ 36). Fernandez testified that, following the inspection of the Deodar Property, he turned to the seller and received a seller's note wherein the seller provided the financing, and Fernandez repaid the seller overtime with an agreement—conveyed by Hansen—that the seller would fix the issues noted in the inspection report prior to the sale. (Dkt. 211 ¶¶ 38–39). With this seller note in hand, Fernandez

[3] Gonzalez signed through a newly created LLC named Spamika LLC so she could have the entity-level protections. (Dkt. 211 ¶ 29).

closed on the Deodar Property on December 14, 2022, for a final cost of $370,000. (Dkt. 211 ¶ 40; Dkt. 212 ¶ 5).

Once the closing was complete, Fernandez testified that he realized that the seller had not fixed any of the issues included in the inspection report prior to the sale. (Dkt. 211 ¶ 42). Fernandez also testified that the Deodar Property was not fully occupied as noted in the single month rent roll he was provided. (Dkt. 211 ¶ 42). However, Brenda Murzyn (Plaintiffs' attorney in the sale) told Fernandez that he had no recourse against the seller because he purchased the property "as is" and there was no such agreement for the repairs in writing. (Dkt. 211 ¶ 42).

Gonzalez testified that she contacted a lender recommended by Hansen and that the lender wanted copies of the Evergreen Property's rent rolls in order to approve funding. (Dkt. 211 ¶ 30). Gonzalez provided the rent rolls to the lender, which Gonzalez testified were too low for the property. (Dkt. 211 ¶ 30). Additionally, her lender required Gonzalez to have the property appraised. (Dkt. 211 ¶ 30). Gonzalez could not recall the results of the appraisal, other than the property having "passed" since her loan was approved. (Dkt. 211 ¶ 30). Gonzalez was also concerned that the rent rolls she received only showed the rolls for one month and did not include a history of the tenancies. (Dkt. 211 ¶ 31). However, Gonzalez ultimately went through with the closing because she planned to eventually adjust the rent. (Dkt. 211 ¶ 31).

Gonzalez hired an inspector to examine the Evergreen Property. (Dkt. 211 ¶ 32). Ms. Gonzalez testified that the inspection report did not include all of the issues with the building, such as one of the units not having a kitchen sink. (Dkt. 211 ¶ 32). Gonzalez did not become aware that the sink was missing until November of 2024, roughly two and a half years after closing on the Evergreen Property in large part to the fact that the tenant never reported the missing sink. (Dkt.

211 ¶ 32). Gonzalez closed on the Evergreen Property in June of 2022 on an "as is" basis for $214,500.00 with a closing credit of $15,000 for her closing costs. (Dkt. 211 ¶ 33).

The seller for both Plaintiffs was the aforementioned LLC, Deodar. (Dkt. 212 ¶¶ 5, 8). Long asserts under penalty of perjury that her entity, TCF, never owned, controlled, or managed Deodar. (Dkt. 206-1 at 1). Long asserts that Deodar's principal was Chojnacki, which Plaintiffs dispute. (Dkt. 212 ¶ 4). Indeed, Deodar's certificate of organization from the State of Indiana states "No principal on record" for "governing person information;" the signature line of the document—stating that the documents contained within are true—features Chojnacki's signature. (Dkt. 206-2). For both Plaintiffs' purchase and sale agreements, Chojnacki signed as the representative of the seller-entity Deodar LLC. (Dkt. 1, Ex. 1-1, 1-2, 1-3, 1-4). It is also undisputed that Chojnacki's mother and EJ Investment's bookkeeper, Iwona Chojnacki, was the sole signer on the Deodar bank account. (Dkt. 221 ¶ 36; Dkt. 223 ¶ 36).

The only significant documentation that Plaintiffs possess for their contention, meanwhile, is a June 23, 2022, email from Irwin to an officer at Chicago Title stating, "the only member of [Deodar] is [TCF], which is directed by Kathleen Long." (Dkt. 210, Exhibit 34). Indeed, much of Plaintiffs' stated facts about Long on this docket have to do with the transactions for other related cases in their entirety. (*See, e.g.*, Dkt. 221 ¶¶ 23, 26). In this matter, Long does not dispute Gonzalez's initial wire was erroneously sent to TCF's account, instead of Deodar's account. (Dkt. 221 ¶ 76; Dkt. 223 ¶ 76). Long submits that the entire sum of the initial wire was sent to the seller-entity Deodar, in which Long had no ownership or access to bank account. (Dkt. 221 ¶ 76).

After closing on the Properties, Hansen emailed Gonzalez with Chojnacki's contact information on June 30, 2022, and Gonzalez emailed him to set up a call, (Dkt. 223 ¶¶ 58, 60; Dkt. 210, Exhibit 38); Plaintiffs both hired Mainstreet Properties, a property management entity owned

by Chojnacki, to manage their properties. (Dkt. 211 ¶ 43). Regarding the Deodar Property, Fernandez testified that Mainstreet withheld rents from him. (Dkt. 211 ¶ 44). However, upon further questioning, Fernandez was unable to point to any evidence of such rents being withheld by Mainstreet. (Dkt. 211 ¶ 44). Regarding the Evergreen Property, Gonzalez testified that although the property was fully occupied when she took possession, the rents were "too low" and needed to be raised. (Dkt. 211 ¶ 45). Ultimately, when Ms. Gonzalez raised the rents for the units in the Evergreen Property, it resulted in all four tenants immediately moving out and the units being empty for approximately four months. (Dkt. 211 ¶ 46).

Both Plaintiffs, ultimately, completed renovations on the buildings and raised rents on their tenants. (Dkt. 211 ¶ 47). Plaintiffs still own their respective Properties and have significantly increased their rental income from both Properties. (Dkt. 211 ¶ 47).

Overall, Plaintiffs are claiming as damages the difference between the initial purchase prices for the Properties by the sellers in their transactions and the purchase prices made by the Plaintiffs (a total amount of $284,500.00) as well as damages related to "rents and repairs" totaling $273,350.00 between the Properties. (Dkt. 211 ¶ 48).

Plaintiffs' evidence for the date of the Defendants' original acquisitions is merely a summary document contained in their expert's report, which itself is insufficient and resulted in a dispute from Defendants; nevertheless, Plaintiffs contend that Deodar acquired the Deodar property on October 25, 2021, for $245,952.00 and the Evergreen Property on October 5, 2021, for $142,733. (Dkt. 223 ¶ 64). It is undisputed that Chojnacki, on behalf of Deodar, signed a property management agreement with Mainstreet Property Management that commenced on October 25, 2021. (Dkt. 221 ¶ 65; Dkt. 223 ¶ 65). Plaintiffs also cite an automated email that Mikosz forwarded to Chojnacki with the subject line "Kathleen Long has signed [Evergreen

Property]" on January 10, 2022. (Dkt. 221 ¶ 65; Dkt. 223 ¶ 65). Plaintiffs suggest that this demonstrates that Long "acted on behalf of Deodar, including signing various documents relating to its acquisition or sale," which Long contends is a contention that goes beyond the reach of the evidence. (Dkt. 221 ¶ 65; Dkt. 223 ¶ 65). An earlier email from July 2021 has Rixer emailing Iwona and Marcin Chojnacki about a group of properties including the two Subject Properties: "Please try and see as many units as you can and take more pictures in the nicer/cleaner units especially as we will use these for marketing to investors;" Iwona replied to Rixer: "Our opinion for these houses is – forget about them! Money pits…" (Dkt. 221 ¶ 66; Dkt. 223 ¶ 66). Regarding Evergreen, Chojnacki told Rixer, "…this one has low ass rents." (Dkt. 221 ¶ 67; Dkt. 223 ¶ 67). To which Rixer replied, "…one of the $300 tenants is a 20- year tenant and the other is the owner's mentally retarded son." (Dkt. 221 ¶ 67; Dkt. 223 ¶ 67).

Fernandez was asked for a computation of his alleged damages, but he could not state what were his repair or rental damages total; rather, he referred counsel to his entire production of discovery documents. (Dkt. 211 ¶ 51). As far as the Evergreen Property, Gonzalez testified that her rental damages are the difference between the rents that were originally charged by her when she originally took ownership of the building and the increased rents that she began charging two years later. (Dkt. 211 ¶ 52). Gonzalez testified that she suffered unexpected repairs to the building that were not completed by the seller or Mainstreet. (Dkt. 211 ¶ 53).

When asked to explain his "rents and repairs" damages, Fernandez stated that the fees paid to the seller as a part of the seller's note on Deodar Property were a part of these damages because they were unnecessary. (Dkt. 211 ¶ 49). Fernandez also testified that the fees charged by Mainstreet were part of his damages because in his opinion they were too high. (Dkt. 211 ¶ 49). When asked specifically about the "repairs" he was claiming, Fernandez simply stated: "I don't

remember how this computation came to be." (Dkt. 211 ¶ 49). Fernandez testified that his repair damages are related to the seller never fixing the issues in the Deodar Property noted on the inspection report and that the building should have been fully occupied on January 1, 2023. (Dkt. 211 ¶ 50). However, Fernandez admitted that he never had any contact with the seller and that all representations about what the seller allegedly agreed to (outside of the closing documents) were made to him by Ms. Hansen. (Dkt. 211 ¶ 50). Plaintiffs did not depose Hansen in this matter. (Dkt. 211 ¶ 50).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

Abbas alleges that Chojnacki himself (as well as some of the Chojnacki entities) violated 18 U.S.C.§ 1962(c), (d),[4] and that Long and the rest of the Chojnacki Defendants (including EJ Investments) violated 18 U.S.C.§ 1962(d). (Dkt. 1 ¶¶ 128–151). Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-

[44] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where some of the entities are only facing allegations under § 1962(d).

1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that either Fernandez or Gonzalez did not get the benefit of their bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, the Plaintiffs' claims about back-end damages due to Defendants' misrepresentations (with Hansen as a mouthpiece). Defendants contend that Plaintiffs' claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010)., Plaintiffs' claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Hansen's alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates. It is true that the "as-is" nature of the sale may impede the back-end damages claims, but if a jury finds that the sale itself was a product of illegal behavior, it may assess the claim differently. It is also true that a real estate broker "holds himself out to people outside of his

field as a professional whose opinion as to matters within the area of his expertise—property value in the case of a broker—can be relied upon in making such decisions as contracting to buy or sell property." *See O'Connor v. Asperger Caraher LLC*, 2006 WL 3210498, at *5 (N.D. Ill. Nov. 6, 2006). While it is true that Plaintiff signed "as is" contracts, this is not a claim about the validity of that purchase as much as it is about the behavior and representations around it.

Turning then to Long's Motion: like in *Lanzetta*, Plaintiffs' claim is different from other cases the related plaintiffs have brought against Long in that Lanzetta did not buy his property from TCF National Holdings, the entity of which Long was the sole shareholder, officer, and signatory. Where this scenario differs from *Lanzetta*, however, is that Plaintiffs have created enough of a disputed record about Long's role, if any, in Deodar, that the Court cannot grant her Motion on this ground. "Only if there are no genuine issues of material fact in dispute is summary judgment appropriate." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999), *abrogated on other grounds by Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025).

Therefore, the analysis laid out in the related cases governs Long's contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants, not Long. (Dkt. 205-1 at 4–6). It is possible for a jury to find even if Long had nothing to do with the predicate acts personally, Long could potentially still be liable under § 1962(d), which requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added).

Of course, it is ultimately possible for a jury to find that the evidence showing that Long's relationship to Plaintiffs' Properties was limited and legal. Yet the argument that NO reasonable jury could find for Plaintiffs on this claim is unpersuasive. Plaintiffs' evidence, though shaky

attimes, could sufficiently tie the Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this standard). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities could allow a jury to infer the Long knowingly participated in the scheme to hide Chojnacki's involvement and saddle investors with misrepresented properties in order to make a quick buck.

It is an even closer question whether Plaintiffs have sufficiently presented a case for a jury with regard to EJ Investments, which hardly features in Plaintiffs' Response. Ultimately, though, the Court declines to rule in favor of summary judgment where Plaintiffs have pieced together evidence that could support the view that EJ Investments (like TCF) facilitated the passing-around of real estate in order to obscure ownership and trick Plaintiffs into thinking they were getting the deal that Defendants themselves were taking. Although mere allegations of a conspiracy are insufficient to withstand a motion for summary judgment, a "conspiracy may be proven by circumstantial evidence and should not be taken from the jury as long as there is a possibility that a jury can reasonably infer from he circumstances that the required elements of conspiracy have been met." *See Chicago Miracle Temple Church, Inc. v. Fox*, 901 F.Supp. 1333, 1348 (N.D.Ill. 1995).

As stated above, Plaintiffs cannot proceed on their "lost investment theory" and the Motions are granted with regard to the "front-end damages" undergirding that theory of injury. Drawing all inferences in favor of Plaintiffs, however, the Motions for Summary Judgment on Count I are otherwise denied.

## I. State-Law Claims (Counts II–V)

Next, Chojnacki moves for summary judgment on Plaintiff's state law claims for common-law fraud (Count II), violation of the IRELA (Count III); negligent misrepresentation (Count IV); and Unjust Enrichment (Count V). (Unlike in most of the related cases, Plaintiffs brought no claim under Illinois's consumer protection statute, though Plaintiff's counsel left in the part of their boilerplate Response brief that argues in defense of such a claim.[5]) Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. None the state law claims cannot survive this stage in the litigation.

### a. Count II: Common Law Fraud and Count IV: Negligent Misrepresentation

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

---

[5] "[A] plaintiff may not attempt to amend his complaint in a response to a motion for summary judgment by adding new claims or new factual allegations." *Janssen v. Reschke*, 2020 WL 6044284, at *7 (N.D. Ill. Oct. 13, 2020).

Starting with Count II: the Chojnacki Defendants highlight that Fernandez and Gonzalez claim that former defendant Hansen made false statements of material fact to them regarding the properties at issue, not Chojnacki. They contend that Chojnacki never made any representations whatsoever to either plaintiff regarding the properties they were purchasing. (Dkt. 203 at 9). Plaintiffs instead point to an email between Chojnacki and Irwin and Hansen that did not include either Plaintiff, discussing Fernandez's financing options. (Dkt. 213 at 20-21). Plaintiffs offer no case law demonstrating how they could rely on a message that they did not receive. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for the Court to "sift through the record and make [the] case for [Fernandez]." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[6] Plaintiffs did not specifically allege a duty in the Amended Complaint. (Dkt. 1 at 29). Nor do they meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response. (Dkt. 213 at 22). Ultimately, though, what dooms Plaintiffs' claim here is the same lack of prosecution that impedes the common law fraud claim. Plaintiffs do not make the requisite arguments here, and the court will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding

---

[6] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases).

that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case"). Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985). After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989).

**b. Count III: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective

buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Defendants acknowledge that Fernandez and Gonzalez were arguably customers, and thus, under the Act, Chojnacki had a duty to refrain from supplying him false information. (Dkt. 203 at 11). Instead, they argue that neither Plaintiff had a conversation with Chojnacki prior to their respective closings. (*Id.* at 12). Thus, the duty was never breached. In Response, Plaintiffs do not acknowledge that they ever brought a claim under IRELA. (Rather, they only acknowledge a claim under the Illinois state consumer protection statute, which was not pleaded.) "Judges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470–71 (7th Cir. 1990) (the Court "cannot be called upon to supply legal research and organization to flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count III.

**c. Count V: Unjust Enrichment**

That leaves the final state-law claim: Count V: unjust enrichment. Both sets of Defendants moved for summary judgment on Count V. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)). Thus, the unjust enrichment claim is barred as to the Chojnacki Defendants as no other state claim survives past this point. Similarly, because there are no alternative state law claims as to Defendant Long, her Motions is granted with regard to Count V. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). ("To the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.").

**CONCLUSION**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [202] and Long's Motion [205] is granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants summary judgment on all state-law claims.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026